**No. 15-50180**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

*IN THE MATTER OF:  JOE JESSE MONGE; ROSANA ELENA MONGE,*
*DEBTORS*

-----------------------------------------------------------------------

*JOE JESSE MONGE; ROSANA ELENA MONGE,*
*APPELLANTS*

*V.*

*ALICIA ROJAS; FRANCISCO JAVIER JAYME,*
*APPELLEES*

---

On Appeal from the United States District Court
For The Western District of Texas
El Paso Division

---

**APPELLANTS' PRINCIPAL BRIEF**

---

MICHAEL R. NEVAREZ, ESQ.
The Law Offices of Michael R. Nevarez
A Professional Corporation
5915 Silver Springs Drive, Building 6, Suite B
El Paso, Texas 79912
Telephone: (915) 584-8000
Facsimile:  (915) 584-8024

ATTORNEY FOR APPELLANTS

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*Appellants:*
>    Joe Jesse Monge and Rosana Elena Monge

>    Represented by Counsel: Michael R. Nevarez
>                                                   The Law Offices Of Michael R. Nevarez, PC

*Respondents:*[1]
>    Alicia Rojas and Francisco Javier Jayme

>    Represented by Counsel: Michael J. Zimprich
>                                                   The Law Offices of Michael J. Zimprich, PLLC[2]


>    /s/ Michael R. Nevarez
>    **MICHAEL R. NEVAREZ**
>    Attorney of Record for Appellants
>        Joe Jesse Monge and Rosana Elena Monge

---

[1]  The District Court ordered Appellants take nothing against Monroj Investments, Inc. and Northeast Patriot Plaza, Inc.  Appellants are not appealing that holding.  Accordingly, Monroj Investments, Inc. and Northeast Patriot Plaza, Inc. do not have an interest in the outcome of this appeal.

[2]  Lane C. Reedman, 4171 N. Mesa, #B201, El Paso, TX 79902 is also listed as Lead Attorney on the docket sheets, but withdrew from this case, pursuant to the United States Bankruptcy Court's Order Granting Motion to Withdraw Attorney for Alicia Rojas and Francisco Javier Jayme (DOC #241), entered December 2, 2013, in Case No. 10-03019.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants suggest that oral argument is not necessary, that the issue(s) presented can be determined upon the record, and that oral argument would not benefit the panel. The positions of the parties are clear and the record uncomplicated.  Fed. R. App. P. 34. As such, Appellants agree to submit the appeal on the briefs, but will not oppose any request for oral argument that may be submitted.

Respectfully Submitted,

/s/ Michael R. Nevarez
**MICHAEL R. NEVAREZ**

Attorney of Record for Appellants
Joe Jesse Monge and
Rosana Elena Monge

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................................. ii

TABLE OF CONTENTS ........................................................................................................iv

TABLE OF AUTHORITIES .................................................................................................vi

JURISDICTIONAL STATEMENT ......................................................................................4

ISSUES PRESENTED..........................................................................................................5

STATEMENT OF THE CASE..............................................................................................7

STATEMENT OF FACTS ....................................................................................................7

I.      The Joint Venture Agreement Of The Parties. .........................................................7

I.      The Fraudulent Sale Of The Thoroughbred Property...............................................8

II.     The Fraudulent Loan Applications For The Thoroughbred Property. ...................12

III.    The Fraudulent Conveyance Of The Thoroughbred Property.................................18

IV.     The Fraudulent LeaseBack Of The Thoroughbred Property...................................22

V.      The Findings And Orders Of The Bankruptcy And District Courts. ......................24

SUMMARY OF ARGUMENT ...........................................................................................26

ARGUMENT .......................................................................................................................27

I.      The Findings Of The USBC And District Court Are Ripe For Appeal. .................27

II.     Standards Of Review. .............................................................................................28

III.    The Order's Failure To Sustain The Monges' Unopposed Objections Was Clearly
        Erroneous, Constitutes Legal Error, And/Or An Abuse Of Discretion..................29

IV.     The Order Finding The Sale, Conveyance And Lease Of The Thoroughbred
        Property To The Monges Was Not Fraudulent Was Clearly Erroneous, Constitutes
        Legal Error, And/Or An Abuse Of Discretion. .....................................................30

        A.      The Sale And Conveyance Of The Thoroughbred Property Was Fraudulent,
                As Jayme Knew He Had No Title To The Thoroughbred Property. ............32

                1.      A Seller Who Falsely Claims To Hold Title To Real Property, And
                        Sells Said Real Property To A Purchaser Who Relied On The False
                        Claim, Commits Fraud.......................................................................32

                2.      A Right To Redeem Foreclosed Real Property Is Not A Property
                        Right Or A "Claim To Ownership". ..................................................36

B.    Rojas And Jayme Fraudulently Misrepresented To The Monges That They Would Timely Make Their Lease Payments On The Thoroughbred Property. ...............................................................................................41

V.    The Order Finding That Jayme Did Not Commit Fraud By Non-Disclosure, In The Sale And Conveyance Of The Thoroughbred Property To The Monges, Was Clearly Erroneous, Constitutes Legal Error, And/Or An Abuse Of Discretion. .....44

VI.    The Order Finding That Rojas And Jayme Did Not Breach A Duty Of Good Faith And Fair Dealings To The Monges Was Clearly Erroneous, Constitutes Legal Error, And/Or An Abuse Of Discretion....................................................................46

VII.    The Order Finding That The Monges Should Have Been Aware There Was No Equity In The Thoroughbred Property Was Clearly Erroneous, Constitutes Legal Error, And/Or An Abuse Of Discretion...................................................................49

VIII.    The Order Finding That The District Court Could Not Determine Who Signed The Four Fraudulent Leases Was Clearly Erroneous, Constitutes Legal Error, And/Or An Abuse Of Discretion. ........................................................................55

IX.    The Order Finding That The Monges Were Not Entitled to Punitive Damages Was Clearly Erroneous, Constitutes Legal Error, And/Or An Abuse Of Discretion. ......57

A.    The Monges Are Entitled To Punitive Damages As Rojas And Jayme Knowingly Committed An Egregious Violation Of The Automatic Stay. ...57

B.    The Monges Are Entitled To Punitive Damages For An Egregious Violation Of The Automatic Stay As Jayme Attempted To Sell The Thoroughbred Property While It Was Part Of The Monges' Bankruptcy Estate. ................60

C.    The Monges Are Entitled To Punitive Damages For Breach Of Contract As Rojas And Jayme Acted Maliciously When They Breached The Contract. ..61

CONCLUSION ...........................................................................................................64

CERTIFICATE OF SERVICE ....................................................................................66

CERTIFICATE OF COMPLIANCE ...........................................................................67

# TABLE OF AUTHORITIES

**Cases**

*Bhandari v. VHA Southwest Community Health Corp.*, 2011 WL 1336512 (D. N.M.,

   March 30, 2011)...................................................................................................32

*Cain v. Champion Window Co. of Albuquerque, LLC*, 142 N.M. 209 (Ct. App. 2007)....31

*Cargill v. Sherrod*, 96 N.M. 431 (N.M. 1981)....................................................................33

*Chavez Properties-Airport Parking Albuquerque, LP v. Lorentzen*, 204 Fed.Appx. 745

   (10th Cir. 2006)..................................................................................................47

*Construction Contracting & Management, Inc. v. McConnell*, 112 N.M. 371 (N.M. 1991)

   ..........................................................................................................................61

*Continental Potash, Inc. v. Freeport-McMoran, Inc.*, 115 N.M. 690 (N.M. 1993) ..........46

*Daly v. Bernstein*, 1892-NMSC-006, 6 N.M. 380, 28 P. 764 ................................32, 34, 45

*Everett v. Gilliland*, 47 N.M. 269 (N.M.1943) ..................................................................32

*Gunby v. Doughton*, 228 P. 603 (N.M. 1924)....................................................................36

*Harrington v. Sorelle*, 313 F.2d 10 (10th Cir. 1963) ........................................................47

*Homestake Mining Co. v. Mid-Continental Exploration Co.*, 282 F.2d 787 (10th Cir.

   1960) ................................................................................................................47

*In re Bloom*, 875 F.2d 224 (9th Cir. 1989).................................................................57, 58

*In re Bouchie*, 324 F.3d 780 (5th Cir. 2003).....................................................................30

*In re Bradley*, 501 F.3d 421 (5th Cir. 2007) .....................................................................30

*In re Burns*, 503 B.R. 666 (Bankr. S.D. Miss. 2013)..........................................59

*In re Dynamic Tours & Transportation, Inc.*, 359 B.R. 336 (Bankr. M.D. Fla. 2006).....58

*In re Greene County Hosp.,* 835 F.2d 589 (5th Cir. 1988).................................27

*In re Jones*, 418 B.R. 687 (Bankr. E.D. La. 2009) ..........................................58

*In re Moore*, 739 F.3d 724 (5th Cir. 2014) ...................................................28

*In re Morrison*, 555 F.3d 473 (5th Cir. 2009).................................................28

*In re Nantahala Village, Inc.*, 976 F.2d 876 (4th Cir. 1992) ................................30

*In re Repine*, 536 F.3d 512 (5th Cir. 2008)...................................................57

*In re Webb,* 954 F.2d 1102 (5th Cir. 1992).....................................................28

*Krupiak v. Payton*, 90 N.M. 252 (N.M. 1977)..................................................44

*Layton v. Thayne*, 133 F.2d 287 (10th Cir. 1943).............................................37

*Lightsey v. Marshall*, 128 N.M. 353 (N.M. 1999)..............................................47

*Mountain Highlands, LLC v. Hendricks*, 2009 WL 1300750 (D. N.M., Feb. 13, 2009) ..34

*Nissan Motor Acceptance Corp. v. Baker*, 239 B.R. 484 (N.D. Tex. 1999) ....................58

*Parker v. Dacres*, 130 U.S. 43 (1889) ...........................................................37

*Plaza National Bank v. Valdez*, 106 N.M. 464 (N.M. 1987)......................................37, 40

*Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 619 F.3d 458 (5th Cir. 2010) ...............................................................................................28

*Quirico v. Lopez*, 106 N.M. 169 (N.M. 1987) ..................................................47

*Robertson v. Carmel Builders Real Estate*, 135 N.M. 641 (Ct. App. 2003) ....................33

*Romero v. Mervyn's*, 109 N.M. 249 (N.M. 1989) ........................................................46, 49

*Steadman v. Turner*, 84 N.M. 738 (Ct.App.1973) ........................................................34, 45

*U.S. v. Olsen*, 4 F.3d 562 (8th Cir. 1993)...........................................................................30

*Ulivarri et al. v. Lovelace*, 38 P.2d 1114 (N.M. 1934)................................................36, 37

*Watson Truck & Supply Co., Inc. v. Males*, 111 N.M. 57 (N.M. 1990) ...........................46

*Wilcox v. Homestake Mining Co.*, 401 F.Supp.2d 1196 (N.M. 2005)..............................32

*Williams v. Stewart*, 137 N.M. 420 (Ct. App. 2005)..........................................................31

*Wirth v. Commercial Resources, Inc.*, 96 N.M. 340 (Ct. App. 1981) .......................passim

## Statutes

11 U.S.C. §362 .....................................................................................................................57

28 U.S.C. §1291 .....................................................................................................................4

28 U.S.C. §158 ......................................................................................................................27

## Rules

Fed. R. Bankr. P. 9033 .........................................................................................................29

No. 15-50180

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT
_____

*IN THE MATTER OF: JOE JESSE MONGE; ROSANA ELENA MONGE,*
*DEBTORS*
-----------------------------------------------------------------

*JOE JESSE MONGE; ROSANA ELENA MONGE,*
*APPELLANTS*

*V.*

*ALICIA ROJAS; FRANCISCO JAVIER JAYME,*
*APPELLEES*
_____

On Appeal from the United States District Court
For The Western District of Texas
El Paso Division
_____

**APPELLANTS' PRINCIPAL BRIEF**
_____

**TO THE HONORABLE COURT OF APPEALS FOR THE FIFTH CIRCUIT:**

On September 5, 2014, the United States Bankruptcy Court for the Western

District of Texas, El Paso Division (hereinafter referred to as the "Bankruptcy

Court"), issued its "Proposed Findings of Fact and Conclusions of Law With

Respect to Trial In Adversary Proceeding No. 10-03019" (hereinafter referred to as

the "Findings of Fact"). The Findings of Fact included, in part, the following

findings:

1.    The MONGES must have realized there was no equity in the Thoroughbred Property at the time of the sale (ROA.2423, Paragraph 92);

2.    The USBC could not determine who signed the four (4) fictitious leases (ROA.2460-ROA.2461, Paragraph 211; ROA.2461, Footnote 13);

3.    The MONGES were not entitled to punitive damages, as there was no egregious violation of the automatic stay (ROA.2474, Paragraph 254), and, when ROJAS and JAYME violated the Lease, they did not exhibit a culpable mental state, which would give rise to punitive damages (ROA.2487, Paragraph 291);

4.    The MONGES did not establish that JAYME's sale of the Thoroughbred Property was fraudulent (ROA.2489, Paragraph 295);

5.    The MONGES did not establish JAYME committed Fraud by Non-Disclosure in the sale of the Thoroughbred Property (ROA.2491-ROA.2492, Paragraph 302); and,

6.    The MONGES did not establish ROJAS and JAYME breached a duty of good faith and fair dealings to the MONGES (ROA.2497-ROA.2498, Paragraph 323).

(hereinafter referred to as the "Findings").

On September 19, 2014, Appellants JOE JESSE MONGE and ROSANA ELENA MONGE (hereinafter jointly referred to as the "MONGES") timely filed "Plaintiffs' Objections to Proposed Findings of Fact and Conclusions of Law" (hereinafter referred to as the "Objections").

Appellees ALICIA ROJAS (hereinafter referred to as "ROJAS") and FRANCISCO JAVIER JAYME (hereinafter referred to as "JAYME") filed no objections whatsoever to the Findings of Fact, timely or otherwise.

Appellants ask the Court to reverse the "Order Adopting In Part Proposed Findings Of Fact And Conclusions Of Law" (hereinafter referred to as the "Order"), entered on January 27, 2015, by the United States District Court for the Western District of Texas, El Paso Division (hereinafter referred to as "District Court"), sustaining the above-listed Findings.

References to the record in this Brief are as follows:

1.    References to the Record filed with this Court are designated as "ROA.(page#)" or "ROA.(page#):(line#)" or "ROA.(page#), Paragraph (paragraph#)".

2.    References to the "Record Excerpts" as filed with this Brief are designated as "RE-M-(page#)" or "RE-O-(page#)".

3.    References to Appellants' trial exhibits" are referenced as "P-(exhibit#), (page#)".

3

## JURISDICTIONAL STATEMENT

1.    Pursuant to 28 U.S.C. §1291, this Court of Appeals has appellate jurisdiction over all final decisions of the District Courts of the United States.

2.    In this appeal, the District Court's Order was final, thus rendering Appellants' appeal ripe for review herein under 28 U.S.C. §1291, because the Orders of the Bankruptcy Court and the District Court conclusively determined all disputed questions.

**ISSUES PRESENTED**

1.      Whether the District Court's Order failing to sustain the MONGES' objections to the Bankruptcy Court's Findings, considering the Objections were completely unopposed by ROJAS and JAYME (hereinafter jointly referred to as the "ROJAS/JAYME"), was clearly erroneous, constituted legal error, and/or an abuse of discretion.

2.      Whether the District Court's Order overruling the MONGES' objection to the Bankruptcy Court's finding that the MONGES must have realized there was no equity in the Thoroughbred Property was clearly erroneous, constituted legal error, and/or an abuse of discretion.

3.      Whether the District Court's Order overruling the MONGES' objection to the Bankruptcy Court's finding that ROJAS/JAYME did not misrepresent to the MONGES that ROJAS/JAYME expected to make their rental payments solely from the equity received through the sale of the Thoroughbred Property was clearly erroneous, constituted legal error, and/or an abuse of discretion.

4.      Whether the District Court's Order overruling the MONGES' objection to the Bankruptcy Court's finding that it could not be determined whether the MONGES signed the four (4) fraudulent leases was clearly erroneous, constituted legal error, and/or an abuse of discretion.

5.      Whether the District Court's Order overruling the MONGES' objection to the Bankruptcy Court's finding that it could not be determined whether ROJAS/JAYME created the four (4) fraudulent leases was clearly erroneous, constituted legal error, and/or an abuse of discretion.

6.      Whether the District Court's Order overruling the MONGES' objection to the Bankruptcy Court's finding that the MONGES were not entitled to punitive damages was clearly erroneous, constituted legal error, and/or an abuse of discretion.

7.      Whether the District Court's Order overruling the MONGES' objection to the Bankruptcy Court's finding that the sale and/or conveyance of the Thoroughbred Property to the MONGES was not fraudulent was clearly erroneous, constituted legal error, and/or an abuse of discretion.

8.      Whether the District Court's Order overruling the MONGES' objection to the Bankruptcy Court's finding that JAYME did not commit Fraud by Non-Disclosure, in the sale and/or conveyance of the Thoroughbred Property, was clearly erroneous, constituted legal error, and/or an abuse of discretion.

9.      Whether the District Court's Order overruling the MONGES' objection to the Bankruptcy Court's finding that ROJAS/JAYME did not breach a duty of good faith and fair dealings to the MONGES was clearly erroneous, constituted legal error, and/or an abuse of discretion.

## STATEMENT OF THE CASE

1.      The Bankruptcy Court, following a trial on the merits in an Adversary Proceeding, issued subject Findings.  The MONGES filed their Objections, with the District Court, as to the above-listed Findings.

2.      The District Court issued its Order overruling Objections of the MONGES to the above-listed Findings of Fact and Conclusions of Law. According to abundant case authorities, the Findings of the Bankruptcy Court, and the Order of the District Court, were clearly erroneous, constitute legal error in their conclusions of law, and can only be deemed to be arbitrary and capricious and/or an abuse of discretion.

## STATEMENT OF FACTS

**I.      The Joint Venture Agreement Of The Parties.**

3.      The MONGES first met Respondents ROJAS/JAYME in late 2005, when the MONGES were looking for financing for the construction of a new home.  (ROA.822:19-ROA.823:4).  While meeting with the MONGES, JAYME mentioned his involvement in developing the Country Cove Subdivision. (ROA.825:8-10).  ROJAS presented the Country Cove Subdivision to the MONGES as an investment opportunity, claiming there were twenty-one (21) lots, and six (6) were ready for construction.  (ROA.1080:21-ROA.1081:11). ROJAS/JAYME proposed that the MONGES, along with ROJAS/JAYME, purchase the Country Cove Subdivision.

4.     ROJAS/JAYME held themselves out as owners of a residence located at 105 Thoroughbred Court, Santa Teresa, New Mexico (hereinafter referred to as the "Thoroughbred Property").  The equity in the Thoroughbred Property was estimated by JAYME to be in the amount of approximately Three Hundred Thousand Dollars ($300,000.00).  (ROA.838:8-9).  ROJAS said all she and JAYME needed, in order to develop the Country Cove Subdivision, was about Three Hundred Thousand Dollars ($300,000.00), and suggested selling the Thoroughbred Property to the MONGES so that the Three Hundred Thousand Dollars ($300,000.00) in equity could be used for the development of the Country Cove Subdivision.  (ROA.1081:13-ROA.1082:3).  Specifically, ROJAS/JAYME proposed that the MONGES purchase the Thoroughbred Property from JAYME, and then lease it to ROJAS, so that ROJAS/JAYME could continue to reside at the Thoroughbred Property.  It was agreed that the rental amount of the Lease would be equal to the full monthly mortgage payments due on the home, so that the MONGES would not lose money on the sale and lease agreement. ROJAS/JAYME would make the mortgage payments directly to the bank. (ROA.1094:18-21).

I.     **The Fraudulent Sale Of The Thoroughbred Property.**

5.     On April 19, 2004, a Complaint for Foreclosure was filed against JAYME by Citibank with the State of New Mexico, County of Don Ana, Third Judicial District Court, Case No. CV-2004-457, with Summons served upon

8

JAYME.  (P-05, RLBA Rivers 000001-RLBA Rivers 000033, and RLBA Rivers 000044-RLBA Rivers 000048).  On June 28, 2004, a Notice of Lis Pendens was filed by Citibank.  (P-05, RLBA Rivers 000048-RLBA Rivers 000050).  On July 7, 2004, a Motion for Default Judgment was filed by Citibank, along with a Certificate confirming service of process was properly served upon JAYME.  (P-05, RLBA Rivers 000053-RLBA Rivers 000056).  On July 24, 2004, a Default Judgment for Foreclosure was obtained by Citibank, as was an Order of Sale.  (P-05, RLBA Rivers 000057-RLBA Rivers 000056).  With the approval of JAYME, the foreclosure sale was twice postponed, with JAYME then filing for bankruptcy to stay the foreclosure.  (P-05, RLBA Rivers 000071-RLBA Rivers 000077).

6.     On September 13, 2005, after dismissal of JAYME's bankruptcy, Citibank reopened the foreclosure proceedings, and obtained a new Order of Sale that was properly served on JAYME.  (P-05, RLBA Rivers 000078-RLBA Rivers 000100).  The new date for the foreclosure sale by Citibank was November 1, 2005, at 2:30 PM, according to the Notice of Sale properly served on JAYME.  (P-05, RLBA Rivers 000101-RLBA Rivers 0000105).

7.     That same day of the foreclosure sale, November 1, 2005, JAYME again filed for bankruptcy in an attempt to stay the foreclosure, and notice of said bankruptcy was filed by JAYME's attorney, with the Third Judicial District Court, Case No. CV-2004-457, at 2:01 PM, although the bankruptcy petition was not

actually entered until 2:09 PM.  (Compare P-05, RLBA Rivers 000106-RLBA Rivers 0000107, with P-28, Jayme BK4-000002).  That same day of the foreclosure sale, November 1, 2005, JAYME filed a motion seeking an emergency hearing to stay the judicial foreclosure sale by Citibank.  (P-28, Jayme BK4-000011-Jayme BK4-000014).

8.     Incredibly, even though JAYME filed the motion to stay Citibank's judicial foreclosure sale of November 1, 2005, JAYME testified at the trial he did not know that the property had been foreclosed upon by Citibank.  (ROA.1794:1-1797:6).  The Bankruptcy Court, however, gave "little probative value to much of the testimony of Mr. Jayme", finding instead that "most of Mr. Jayme's testimony lacked credibility, that his version of the events (particularly with respect to the Thoroughbred Property) were not supported by logic and were often contradicted by written documents, and was sometimes incomprehensible".  (ROA.2405).

9.     However, on November 2, 2005, the parties determined there was no need for an emergency hearing concerning the stay, because (a) the foreclosure sale of the Thoroughbred Property had already been held, on November 1, 2005, at 2:30 PM, at which time the property was sold to Citibank, for the full amount of the foreclosure judgment, and (b) Citibank had agreed "not to submit the Order Approving Sale to District Court until there is a resolution" of yet another motion filed by JAYME.  (P-28, Jayme BK4-000015-Jayme BK4-000016, and Jayme

BK4-000164-Jayme BK4-000165).

10.    Significantly, on November 16, 2005, JAYME personally signed an amendment to his petition, therein admitting to a foreclosure decree having been entered in said Third Judicial District Court, Case No. CV-2004-457.  (P-28, Jayme BK4-000133).  In short, as of November 16, 2005, JAYME new full-well that the Thoroughbred Property had already been sold to Citibank due to Citibank's foreclosure.

11.    One month later, on December 18, 2005, the MONGES and JAYME signed a Purchase Agreement, written by JAYME, a licensed real estate agent, whereby JAYME agreed "to sell and convey" the Thoroughbred Property to the MONGES.  (P-01, DAT Parsley 000358-DAT Parsley 000366; ROA.33, and 1794:5-21).  However, at the time of the bilateral execution of said contract on December 18, 2005, JAYME did not disclose to the MONGES the material facts that (a) JAYME was in bankruptcy proceedings, or (b) the Thoroughbred Property was part of JAYME's bankruptcy estate, or (c) the Thoroughbred Property had already been purchased by Citibank at a foreclosure sale on November 1, 2005.  (ROA.1093:18-22).

12.    The same day the contract was signed, December 18, 2005, ROJAS/JAYME sent a facsimile, with a payoff request for the Thoroughbred Property, to Little & Dranttel, P.C.  (P-01, DAT Parsley 000129; ROA.1795:14-

ROA.1796:10; ROA.1880:20-ROA.1881:8).  It was sent to Little & Dranttel

because they were the attorneys who had represented Citibank in the foreclosure

sale, and knew the payoff amount.  (ROA.1798:7-10).

13.    Then, on December 22, 2005, JAYME's bankruptcy case was

dismissed, with Citibank remaining as owner of the Thoroughbred Property, due to

Citibank's purchase of the Thoroughbred Property at the foreclosure sale, held on

November 1, 2005.  (P-28, Jayme BK4-000176-Jayme BK4-000177).

## II.    The Fraudulent Loan Applications For The Thoroughbred Property.

14.    From January 10, 2006, through February 8, 2006, ROJAS, an

attorney and a licensed mortgage broker doing business as First Mortgage of El

Paso, began filling out and submitting loan applications on behalf of the

MONGES, to America's Wholesale Lender.  (ROA.32-ROA.33).  Among the

documents submitted were eight (8) different loan applications, including three (3)

dated January 30, 2006.  Several of the loan applications are on ROJAS' own

forms for First Mortgage of El Paso (P-10, BOA Thoroughbred 000355-BOA

Thoroughbred 000363) and several are filled out on America's Wholesale Lender's

forms (P-10, BOA Thoroughbred 000008-BOA Thoroughbred 000017; BOA

Thoroughbred 000355-BOA Thoroughbred 000363; BOA Thoroughbred 000442-

BOA Thoroughbred 000446; BOA Thoroughbred 000473-BOA Thoroughbred

000477).  Another was filled out for Countrywide, and listed First Mortgage of El

Paso as the business partner.  (P-10, BofA-Thoroughbred-000353).  On these

12

applications, many of the entries change dramatically from document to document, including the loan amount, interest rate, amortization type, gross monthly income entries, combined monthly household expenses, assets, real estate owned, creditors, liabilities, and net worth. Additionally, there is a letter of denial dated January 17, 2006 (P-10, BofA-Thoroughbred-000534-BofA-Thoroughbred-000536), as well as a loan approval, also dated January 17, 2006, and a second approval dated February 6, 2006 (P-10, BofA-Thoroughbred-000500-BofA-Thoroughbred-000502). An Allstate Homeowners Insurance Policy was issued, in the MONGES' names, effective January 13, 2006 (P-32, LR 000188-LR 000192).

15. As part of the process to secure a mortgage, America's Wholesale Lender required a Signature and Name Certification for each of the MONGES. On one such Certification, JOE MONGE incorrectly lists an alternative name as "Jose Monge"; however, he never uses such a name. (P-10, BofA-Thoroughbred-000204; BofA-Thoroughbred-000206).

16. ROJAS/JAYME also fabricated several leases which were included in the loan applications. The leases were drafted by Aracelli Herrera, a loan processor employed by ROJAS from 2004 to 2008, and who was the only processor to work on the Thoroughbred Property. (ROA.1566:19-ROA.1567:11).

17. The first fraudulent lease purported to lease out a property at 100 West 6th St., Lordsburg, New Mexico, and was faxed from First Mortgage of El

Paso at 10:46 am, on January 10, 2006. The signature for lessor incorrectly reads "Joe R. Monge". (P-10, BofA-Thoroughbred-000276-BofA-Thoroughbred-000277). The lease was also accompanied by a Request for Verification of Deposit, also sent from First Mortgage of El Paso. (P-10, BofA-Thoroughbred-000278).

18.     The second fraudulent lease purported to lease out a property at 2708 Fillmore Ave. in El Paso, Texas to "Dr. Peter Natividad", and was faxed from First Mortgage of El Paso on January 27, 2006, at 4:05 pm. (P-10, BofA-Thoroughbred-000279-BofA-Thoroughbred-000280). However, Natividad has testified that he never had a lease with the MONGES, never resided at 2708 Fillmore Avenue, and the signature on the lease does not belong to him. (ROA.1157:24-ROA.1158:7). The lease was accompanied by a check from a false bank account, supposedly belonging to Natividad. (P-10, BofA-Thoroughbred-000281). The signature and initials on the check do not belong to Natividad. (ROA.1158:21-23). Additionally, the check is dated December 6, 2005, but the check processing dated is listed as February 4, 2005. (ROA.1158:24-ROA.1159:4).

19.     Both the first and second fraudulent leases were included on a Uniform Residential Loan Application (P-10, BofA-Thoroughbred-000361-BofA-Thoroughbred-000363), for the Thoroughbred Property, in the Assets and

Liabilities section (P-10, BofA-Thoroughbred-000363).  The application was created by First Mortgage of El Paso, and it was faxed at 10:14 am on January 10, 2006.  (ROA.1581:15-20).  Both leases were also included on a Schedule of Real Estate Owned, which was filed with America's Wholesale Lender.  (P-10, BofA-Thoroughbred-000446).

20.     The third fraudulent lease purported to rent out the Thoroughbred Property to Luis and Alejandra Marioni (now Alejandra Hernandez), for the same period the Thoroughbred Property was being rented by ROJAS/JAYME, and was faxed from First Mortgage of El Paso at 4:35 pm.  (P-11, BofA-Sierra-Crest1-000673-BofA-Sierra-Crest1-000674).  Both Marioni and Hernandez have testified they never entered into a lease with the MONGES for the Thoroughbred Property (ROA.1165:10-13; ROA.1171:11-13), have never lived at the Thoroughbred Property (ROA.1164:15-18; ROA.1171:9-10), and the signatures on the lease do not belong to them (ROA.1165:1-2; ROA.1171:14-17).  The fourth fraudulent lease, faxed from First Mortgage of El Paso at 4:36 pm, purported to lease out a property at 2708 Fillmore Ave. in El Paso, Texas to Joe Villa, for the same term that the property was allegedly leased out to Natividad in the second fraudulent lease.  (P-11, BofA-Sierra-Crest1-000675-BofA-Sierra-Crest1-000676).

21.     Both the third and fourth fraudulent leases were included, in the Assets and Liabilities section (P-11, BofA-Sierra-Crest1-000768), on a loan

application (P-11, BofA-Sierra-Crest1-000766-BofA-Sierra-Crest1-000769) for the Sierra Crest Property, which was filed by ROJAS (ROA.1265:22-23), and faxed from First Mortgage at 4:38 pm.  There is also a second copy of "Page 3 of 4" for the loan application, in which the Assets and Liabilities are blank.  (P-11, BofA-Sierra-Crest1-000769).  The first copy contains the fraudulent leases but no signature of the MONGES.  The second copy does contain the signature of the MONGES, but does not list the fraudulent leases.

22.    The MONGES denied signing any of the fraudulent leases (ROA.1262:23-ROA.1263:7; ROA.1260:21-24; ROA.1264:14-ROA.1265:13; ROA.1265:19-21), or the Schedule of Real Estate Owned (ROA.1604:9-16).  Significantly, ROSANA MONGE did not get off work until after 5 pm (ROA.1569:12-14), and could not fax any documents from First Mortgage prior to then.  Any documents faxed prior to 5 pm had to have been sent by ROJAS, JAYME, or Herrera.  Herrera has admitted to preparing the leases (ROA.1583:10-11; ROA.1584:15-19; ROA.1571:16-18; ROA.1575:22-ROA.1576:4), with information provided to her by ROJAS (ROA.1584:4-7; ROA.1573:5-10).  Furthermore, Herrera admitted ROJAS occasionally provided her with blank copies of documents which bore the MONGES' signatures.  (ROA.1588:13-16).

23.    A loan was approved for Six Hundred Ninety-Seven Thousand Five Hundred Dollars ($697,500.00).  (P-10, BofA-Thoroughbred-000321-BofA-

16

Thoroughbred-000328).  America's Wholesale Lender sent the Closing

Instructions to Dona Ana Title.  (P-03, DAT Jeter 000052-DAT Jeter 000130).

The Closing Instructions included the requirement that "Rosana E. Maldonado"

(ROSANA MONGE's maiden name which she does not use) and "Jose Monge" be

added to the loan.  (P-03, DAT Jeter 000084).  A Loan Application Disclosure

Acknowledgments was signed on February 3, 2006.  (P-10, BofA-Thoroughbred-

000138).  However, JOE MONGE disputes his signature on the document.

Similarly, JOE MONGE disputes his signature on the Good Faith Estimate (P-10,

BofA-Thoroughbred-000143), the Truth in Lending Disclosure Statement (P-10,

BofA-Thoroughbred-000144), the Seller's and/or Purchaser's/Borrower's

Statement (P-10, BofA-Thoroughbred-000164), as well as the Request for

Taxpayer Identification Number and Certification (P-10, BofA-Thoroughbred-

000165).  Several (unsigned) copies of documents incorrectly list the borrower as

"Joe J. Mongo".  (P-10, BofA-Thoroughbred-000141-BofA-Thoroughbred-

000142; BofA-Thoroughbred-000151; BofA-Thoroughbred-000208-BofA-

Thoroughbred-000210).

24.    Six (6) different HUD-1 Settlement Statements were created, which

list various amounts of equity in the Thoroughbred Property, and five (5) state they

are "FINAL".  (P-04, FATI-Peterman-000045-FATI-Peterman-000047; FATI-

Peterman-000120-FATI-Peterman-000121; FATI-Peterman-000129-FATI-

Peterman-000130; FATI-Peterman-000133-FATI-Peterman-000134; P-11, BofA-Sierra-Crest1-000839-BofA-Sierra-Crest1-000841; P-10, BofA-Thoroughbred-000364-BofA-Thoroughbred-000366).  The MONGES' signatures and handwriting appear only on page three (3) of the HUD-1s (P-04, FATI-Peterman-000045-FATI-Peterman-000047; P-11, BofA-Sierra-Crest1-000839-BofA-Sierra-Crest1-000841; P-10, BofA-Thoroughbred-000364-BofA-Thoroughbred-000366). However, the MONGES testified their signatures were forged on these pages, and no evidence was adduced to refute the MONGES' testimony that their signatures were forged on these pages.  (ROA.1617:4-13).  The HUD-1 approved by Countrywide does not have the MONGES' signatures.  (P-04, FATI-Peterman-000120-FATI-Peterman-000121).

## III.     The Fraudulent Conveyance Of The Thoroughbred Property.

25.     The sale of the Thoroughbred Property closed on February 3, 2006, at the Red Lobster Restaurant, in El Paso, Texas.  (ROA.1098:7-14).  At the closing, the MONGES still were not aware, and had not been informed, that the Thoroughbred Property had been foreclosed upon by Citibank, even though ROJAS and Ms. Blount were present at the closing.  (ROA.1175:9-ROA.1176:5). Perhaps more significantly, prior to closing, the MONGES had not been provided any of the closing documents, and had not received even a copy of the HUD-1. (ROA.1232:2-1233:21; ROA.1176:6-14; ROA.1698:19-21; ROA.1235:17-ROA.1237:10).  And when ROSANA MONGE asked ROJAS for a breakdown of

the disbursements from the sale, after the closing, ROJAS, instead of providing a

HUD-1 or the Disbursement Report, wrote on a sticky that there had been Three

Hundred One Thousand Dollars ($301,000.00) in equity.  (ROA.1233:16-23).  In

any event, no evidence was adduced to refute the testimony of the MONGES that,

prior to closing, the MONGES had not been provided any of the closing

documents.

26.     Three (3) days after the closing, the Warranty Deed, generated and

notarized by Shawna C. Gonzales of Dona Ana Title, was filed with the Dona Ana

County Clerk, on February 6, 2006.  (P-02, DAT Blount 000005).  Also filed was a

mortgage, from America's Wholesale Lender, on the Thoroughbred Property.  The

loan was subsequently transferred to Countrywide.  (P-02, DAT Blount 000006-

DAT Blount 000021).

27.     Critically, Shawna Blount, f/k/a Shawna Gonzales, an employee of

Dona Ana Title, processed the purchase agreement, Warranty Deed, and the

Mortgage for the Thoroughbred Property.  (P-01, DAT Parsley 000358-DAT

Parsley 000369; ROA.1017:10-18).  Ms. Blount also notarized and filed the

Warranty Deed and the Mortgage with the Dona Ana County Clerk's office, even

though the title search performed by Dona Ana Title revealed the filing of a Lis

Pendens by Citibank (P-01, DAT Parsley 0000006, and DAT Parsley 0000012),

and the notice of the foreclosure sale on November 1, 2005, on the Thoroughbred

Property (P-01, DAT Parsley 000015).  Moreover, the Title Commitment, which

was ordered by JAYME, on Schedule B, listed among the requirements that the Lis

Pendens filed by Citibank be released and that Citibank's foreclosure case be

dismissed.  (P-01, DAT Parsley 000006 and DAT Parsley 000361).

28.     It is clear then Blount knew or should have known at the closing that

(a) the Thoroughbred Property was in foreclosure litigation with JAYME's

mortgage company, Citibank, (b) JAYME was in bankruptcy proceedings (P-01,

DAT Parsley 000015), and therefore (c) JAYME's right to convey title to the

Thoroughbred Property was in the hands of two (2) courts, but never informed the

MONGES of same.  (ROA.1033:19-1035:07).  Again, the un-contradicted

testimony in the record is that, prior to closing, or even at the closing, the

MONGES were not provided with any of the closing documents, which would

have included the Title Commitment Policy, and a copy of the HUD-1.

(ROA.1232:2-1233:21; ROA.1176:6-14; ROA.1698:19-21; ROA.1235:17-

ROA.1237:10)(P-01, DAT Parsley 000005-DAT Parsley 000019).

29.     With the assistance of Blount, JAYME used the proceeds of the

fraudulent sale and conveyance to redeem and re-purchase the Thoroughbred

Property from Citibank.  Blount sent a letter, dated February 6, 2006, to Little &

Dranttel, enclosing a payoff check in the amount of Five Hundred Sixty-Two

Thousand Fifty-Eight Dollars and Ninety-Eight Cents ($562,058.98).  (P-01, DAT

Parsley 000164).  Upon receiving the check, Little & Dranttel returned it to Dona

Ana Title, stating the amount was short due to Little & Dranttel's fees.  (P-01,

DAT Parsley 000167; ROA.1028:18-23).  Dona Ana Title then wired a payoff of

Five Hundred Sixty-Seven Thousand Four Hundred Forty Dollars and Fifty-Four

Cents ($567,440.54) on February 8, 2006.  (P-01, DAT Parsley 000169).  On

March 6, 2006, Citibank filed a Release of Mortgage, regarding JAYME's

mortgage on the Thoroughbred Property, and listed a date of satisfaction as

February 27, 2006.  (P-06, STC Thoroughbred 000096).

30.    On June 27, 2006, Citibank granted the Thoroughbred Property to

JAYME in a Quit Claim Deed.  (P-01, DAT Parsley 000322-DAT Parsley

000323).  One minute after the Quit Claim Deed was filed, Dona Ana Title re-filed

the Warranty Deed with which JAYME had fraudulently transferred title to the

Thoroughbred Property.  Added to the top of the photocopied and re-recorded

Warranty Deed was a typed notation stating, "This Warranty Deed is being re-

recorded in correction of but not in lieu of the same; to correct filing order."  (P-02,

DAT Blount 000022).  That same day, the mortgage was similarly refiled.  (P-02,

DAT Blount 000023-DAT Blount 000038).

31.    At the trial, Ms. Blount testified that the Special Master's Deed (P-01,

DAT Parsley 000033-DAT Parsley 000034) was indeed a cloud on title to the

Thoroughbred Property which needed to be cured (ROA.1033:14-18), because (a)

title to the Thoroughbred Property had been transferred to Citibank prior to closing, and (b) JAYME was not actually the owner of the Thoroughbred Property at the time of the closing.  (ROA.1033:19-1034:20).

32.    On December 8, 2006, more than ten (10) months after the closing, Dona Ana Title mailed the "conveyance documents" and the "title policy" to the MONGES.  (P-01, DAT-Parsley 000342 and DAT-Parsley 000348).  However, Dona Ana Title did not forward said documents to the MONGES's correct address, so ROSANA MONGE called to request a complete set of documents from Dona Ana Title.  (P-01, DAT-Parsley 000342; ROA.1236:21-ROA.1237:10).  Significantly, Dona Ana Title never forwarded the correction deeds to the MONGES, so the MONGES were not aware that correction deeds had been filed by Dona Ana Title, until six (6) years later, in March 2012. (P-02, DAT Blount 000005-DAT Blount 000021, and DAT Blount 000022-DAT Blount 000038; ROA.1232:2-10; ROA 1236:12-1236:20; ROA.1176:6-12; ROA.1698:19-21; ROA.1235:17-ROA.1236:5).

**IV.    The Fraudulent LeaseBack Of The Thoroughbred Property.**

33.    The Residential Lease on the Thoroughbred Property was signed on February 3, 2006.  (P-31, LR-000057–LR-000065).  Rent under the Residential Lease was "due and payable on or before the first day of each and every calendar month during the Term", commencing on February 1, 2006 (the "Commencement Date").  (P-31, LR-000058).

34.     The first rental payment check from ROJAS bounced and was reversed by the mortgage holder.  (ROA.1181:21-ROA.1182:4).  A review of ROJAS' bank statements shows there was not enough money in her account to cover the check.  (P-18, CBT Rojas-000100; ROA.1899:21-ROA.1900:7).

35.     As another example, on September 30, 2007, Rojas wrote another check to Countrywide, for Seven Thousand Nineteen Dollars and Ninety-Nine Cents ($7,019.99), when she only had between One Thousand Three Hundred Sixty-Three Dollars and Forty-Six Cents ($1,363.46) and a negative balance of Six Hundred Fifty Dollars and Forty-Five Cents ($650.45) in her account.  (P-31, Monge-Mortgage-Pmts-000064; P-18, CBT Rojas-000015; ROA.1910:17-ROA.1911:1).

36.     In fact, in the months immediately prior to, and after, the signing of the Lease, ROJAS did not have enough funds in her accounts to make the required rent payments.  (P-18, CBT Rojas-000087-CBT Rojas-000101; CBT Rojas-000255-CBT Rojas-000276; P-16, Compass-FirstMTG-000002-Compass-FirstMTG-000017).  JAYME also did not have enough funds in his accounts to make the required rent payments, in the months immediately prior to, and after, the signing of the Lease.  (P-13, P-14 and P-15).  Thus, ROJAS/JAYME consistently did not have enough money in their bank accounts to make the required payments throughout the Term of the Lease.  (P-13, P-14, P-15, P-16, and P-18).

37.    Consequently, the MONGES were forced to make their mortgage payments to the bank, without the benefit of the rent payments due from ROJAS/JAYME, in an ultimately failed effort to keep the Thoroughbred Property out of foreclosure.  Without receiving any additional payments from ROJAS/JAYME, the MONGES were forced to file for Bankruptcy protection. (ROA.1305:16-ROA.1306:1; P-31).

**V.    The Findings And Orders Of The Bankruptcy And District Courts.**

38.    On June 14, 2010, in the United States Bankruptcy Court for the Western District of Texas (hereinafter referred to as the "USBC"), Plaintiffs filed the Complaint in Adversary Proceeding No. 09-30881-lmc (hereinafter referred to as the "AP"), seeking the turnover of the Thoroughbred Property.

39.    In February 2012, JAYME, without the authorization of the MONGES, created a FAST Order sheet to try to sell the Thoroughbred Property. (P-04, FATI-Peterman-000233-FATI-Peterman-000237; ROA.1272:9-ROA.1273:9).  The seller of the Thoroughbred Property was listed as "Jayme Francisco J", and the buyer was listed as "Jayme Joe J".  (P-04, FATI-Peterman-000235).  Incredibly, JAYME tried to sell the Thoroughbred Property, while the MONGES were still in bankruptcy, and while the Thoroughbred Property was the subject of the AP.  The sale appears to have fallen through, presumably because a title search, by First American Title Company, revealed the Thoroughbred Property was actually owned by the MONGES.  (P-04, FATI-Peterman-000237).

40.    The trial in the AP was completed on August 8, 2014.  On September

5, 2014, the USBC filed its "Proposed Findings of Fact and Conclusions of Law

with Respect to Trial in Adversary Proceeding No. 10-03019" (ROA.2392-

ROA.2573)(hereinafter referred to as the "Findings of Fact").  The Findings of

Fact included, in part, the above-listed Findings.

41.    On September 18, 2014, "Plaintiffs' Objections to Proposed Findings

of Fact and Conclusions of Law with Respect to Trial in Adversary Proceeding No.

10-03019" (ROA.2597-ROA.2640)(hereinafter referred to as the "Objections to

Proposed Findings") was timely filed by the MONGES, objecting to the above-

listed findings in the Findings of Fact.  ROJAS/JAYME filed no objections

whatsoever, timely or otherwise.

42.    On January 27, 2015, the District Court filed an "Order Adopting In

Part Proposed Findings Of Fact And Conclusions Of Law" (ROA.2940-

ROA.2972)(hereinafter referred to as the "Final Order"), which overruled the

Objections to Proposed Findings, in regards to the above-listed Findings in the

Findings of Fact.  The Final Order held Creditors shall recover, from Debtors,

jointly and severally, (a) actual damages in the amount of Seven Hundred Fifty-

Seven Thousand One Hundred Sixteen Dollars ($757,116.00) [plus $39,610, the

amount of $7,992 a month from September 2014 through January 2015], with

prejudgment interest in the amount of Eight Point Forty-Three Percent (8.43%) per

annum, (b) attorneys' fees and expenses in the amount of Two Hundred Forty

Thousand Two Hundred Thirty-Eight Dollars ($240,238), and (c) post-judgment

compounded interest in the amount of Point Eighteen Percent (0.18%) per annum

until paid in full.  (ROA.2970).

43.     On January 27, 2015, the District Court issued a Final Judgment

(ROA.2973) which closed the WDTX.

## SUMMARY OF ARGUMENT

44.     The Final Order overruled the MONGES' unopposed objections to the

following USBC findings:

a.     The MONGES did not establish that ROJAS/JAYME committed Fraud in the sale, conveyance, and lease of the Thoroughbred Property;

b.     The MONGES did not establish ROJAS/JAYME committed Fraud by Non-Disclosure in the sale, conveyance, and lease of the Thoroughbred Property;

c.     The MONGES did not establish ROJAS/JAYME breached a duty of good faith and fair dealings to the MONGES;

d.     The MONGES must have realized there was no equity in the Thoroughbred Property at the time of the sale;

e.     It could not be determined who signed the four (4) fictitious leases; and,

f.     The MONGES were not entitled to punitive damages.

45.     However, the uncontroverted record and abundant case law clearly

establishes the Final Order was clearly erroneous as to the findings of fact,

constituted legal error in the conclusions of law upon *de novo* review, and can only

be deemed to be arbitrary and capricious and/or an abuse of discretion.

## ARGUMENT

## I.    The Findings Of The USBC And District Court Are Ripe For Appeal.

46.    Under 28 U.S.C. §158, this Court's appellate jurisdiction is limited to final orders and judgments.  28 U.S.C. §158(d)(1) ("The courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered under subsections (a) and (b) of this section."); *In re Greene County Hosp.,* 835 F.2d 589, 591 (5ᵗʰ Cir. 1988), *cert. denied,* 488 U.S. 820, 109 S. Ct. 64, 102 L.Ed.2d 41 (1988)(Citing 28 U.S.C. §158 to state the court has jurisdiction to hear appeals regarding "final decisions, judgments, orders, and decrees.").

47.    The Bankruptcy Court issued its Findings of Fact on September 5, 2014.  On January 27, 2015, the District Court adopted, in part, the Findings of Fact, and issued a Final Judgment in the case.  Accordingly, Appellants' appeals are ripe for review, because the Orders of the Bankruptcy Court and the District Court conclusively determined the following disputed questions:

a.    Whether ROJAS/JAYME committed Fraud in the sale and lease of the Thoroughbred Property;

b.    Whether JAYME committed Fraud by Non-Disclosure in the sale of the Thoroughbred Property;

c.    Whether ROJAS/JAYME breached a duty of good faith and fair dealings to the MONGES.

d.    Whether the MONGES realized there was no equity in the Thoroughbred Property;

        e.     Whether the MONGES signed the four fraudulent leases; and,

        f.     Whether the MONGES are entitled to punitive damages.

## II.    Standards Of Review.

48.    In reviewing a bankruptcy appeal from the District Court, this Court applies the same standard to the Bankruptcy Court's findings of fact and conclusions of law that the District Court applied. *In re Morrison*, 555 F.3d 473, 480 (5th Cir. 2009) ("We review the decision of the district court by applying the same standard to the bankruptcy court's findings of fact and conclusions of law that the district court applied."); *In re Webb,* 954 F.2d 1102, 1103-04 (5th Cir. 1992). Under said standard, this Court reviews findings of fact under the clearly erroneous standard, and conclusions of law *de novo*. *In re Morrison*, 555 F.3d at 480 ("A bankruptcy court's findings of fact are subject to review for clear error, and its conclusions of law are reviewed de novo.").

49.    In areas where the Bankruptcy Court had discretion, this Court must determine whether the District Court appropriately applied an abuse of discretion standard in reviewing the Bankruptcy Court's Orders. *In re Moore*, 739 F.3d 724, 729 (5th Cir. 2014) ("We review de novo a district court's invocation of its inherent power and the sanctions granted under its inherent power for an abuse of discretion.")(citing *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010)).

50.    In this appeal, since the Bankruptcy Court issued findings of fact and

conclusions of law, and because the District Court overruled the objections to findings of fact and conclusions of law, this Court should apply the clearly erroneous standard to findings of fact, and review conclusions of law *de novo*.

**III.    The Order's Failure To Sustain The Monges' Unopposed Objections Was Clearly Erroneous, Constitutes Legal Error, And/Or An Abuse Of Discretion.**

51.    Under Bankruptcy Rule 9033, the MONGES, as well as ROJAS/JAYME, had fourteen (14) days to file objections to the Findings of Fact. Fed. R. Bankr. P. 9033(b) ("Within 14 days after being served with a copy of the proposed findings of fact and conclusions of law a party may serve and file with the clerk written objections which identify the specific proposed findings or conclusions objected to and state the grounds for such objection."). ROJAS/JAYME did not file any objections.  Accordingly, the time to file objections to the Findings of Fact has passed.

52.    Additionally, ROJAS/JAYME had fourteen (14) days to file a response to the MONGES' Objections to Proposed Findings.  Fed. R. Bankr. P. 9033(b) ("A party may respond to another party's objections within 14 days after being served with a copy thereof.").  However, ROJAS/JAYME did not file any response to the Objections to Proposed Findings.

53.    Therefore, as ROJAS/JAYME did not file any objection to the Findings of Fact, or any response to the Objections to Proposed Findings, ROJAS/JAYME effectively waived their right to appeal the Findings of Fact, or

present any legal issue to the District Court in response to the Objections to Proposed Findings. *In re Bradley*, 501 F.3d 421, 433 (5th Cir. 2007) ("Even if an issue is raised and considered in the bankruptcy court, this court will deem the issue waived if the party seeking review failed to raise it in the district court.")(citing *U.S. v. Olsen*, 4 F.3d 562, 567 (8th Cir. 1993) ("Although this issue was considered by the bankruptcy court, the lawyers failed to reassert the issue on their appeal to the district court. Accordingly, this issue should not be considered by this court at all as it was waived when the lawyers did not bring it to the attention of the district court.")); *see also In re Bouchie*, 324 F.3d 780, 782 n. 6 (5th Cir. 2003) ("As Rush Truck did not present this argument to the district court, we will not consider it on appeal."); *In re Nantahala Village, Inc.*, 976 F.2d 876, 880 (4th Cir. 1992) ("In our view, Nantahala, by not objecting to any part of the bankruptcy court's recommendation, has waived its rights to present in this court consequent issues which it did not contest in the district court.").

54.     Because ROJAS/JAYME waived their right to appeal the Findings of Fact, or present any legal issue to the District Court in opposition to the Objections to Proposed Findings, the District Court should not have even considered any of subject issues at all, and should have sustained all of the MONGES' objections presented in the Objections to Proposed Findings.

**IV.     The Order Finding The Sale, Conveyance And Lease Of The Thoroughbred Property To The Monges Was Not Fraudulent Was**

**Clearly Erroneous, Constitutes Legal Error, And/Or An Abuse Of Discretion.**

55.     It is well established in New Mexico law that a claim for fraud requires a showing of "a misrepresentation of a fact, known to be untrue by the maker, and made with an intent to deceive and to induce the other party to act upon it with the other party relying upon it to his injury or detriment." *Unser v. Unser*, 86 N.M. 648, 653-654 (N.M. 1974); *Cain v. Champion Window Co. of Albuquerque, LLC*, 142 N.M. 209, 216 (Ct. App. 2007)("The elements of fraud include (1) a misrepresentation of fact, (2) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (3) intent to deceive and to induce reliance on the misrepresentation, and (4) detrimental reliance on the misrepresentation.")(quoting *Williams v. Stewart*, 137 N.M. 420, 429 (Ct. App. 2005) .

56.     Additionally, when one party is under a duty to disclose material information to another party, omitting such information is held to be the same as making a false claim. *Wirth v. Commercial Resources, Inc.*, 96 N.M. 340, 345 (Ct. App. 1981)("An omission as well as an act, may constitute fraud.  When one is under the duty to speak, but remains silent and so fails to disclose a material fact, he may be liable for fraud.").  Such a duty to disclose arises when the party omitting information holds superior knowledge, and knows the other party is acting under a mistaken belief, due to the withholding of the superior knowledge.

31

*Wilcox v. Homestake Mining Co.*, 401 F.Supp.2d 1196, 1204 (N.M. 2005) (Holding "a common law duty to disclose in New Mexico ... arises from knowledge that the other party is acting under a mistaken belief, or if a party has superior knowledge not within the reach of the other party or which could not have been discovered by the exercise of reasonable diligence."); *Bhandari v. VHA Southwest Community Health Corp.*, 2011 WL 1336512, at \*17 (D. N.M., March 30, 2011)("Superior knowledge will give rise to a duty to disclose.").

57.     A duty to disclose is also created when one party reveals some information, but omits material facts.  *Wirth v. Commercial Resources, Inc.*, 96 N.M. at 345 ("To reveal some information on a subject triggers the duty to reveal all known material facts.  Having discussed the availability of water with Wirth, McGregor was under a duty to disclose all material facts concerning this problem.")(citing *Everett v. Gilliland*, 47 N.M. 269 (N.M.1943), internal citation omitted).

**A.     The Sale And Conveyance Of The Thoroughbred Property Was Fraudulent, As Jayme Knew He Had No Title To The Thoroughbred Property.**

**1.     A Seller Who Falsely Claims To Hold Title To Real Property, And Sells Said Real Property To A Purchaser Who Relied On The False Claim, Commits Fraud.**

58.     New Mexico has held fraud is found when a party falsely claims to hold title to real property, and sells the real property to a purchaser who relied on the false claim.  *Daly v. Bernstein*, 1892-NMSC-006, 6 N.M. 380, 28 P. 764

(Holding a sale of real property was fraudulent when the seller did not hold title, represented to the buyer that he did hold title, and the buyer relied on that representation.); *Robertson v. Carmel Builders Real Estate*, 135 N.M. 641, 650 (Ct. App. 2003)(Holding a broker was liable for fraud when the broker sold property, without permission of the owner, as the broker made "a false representation, knowingly or recklessly made, with the intent to deceive, on which the other party acted to his detriment".); *Cargill v. Sherrod*, 96 N.M. 431, 432-433 (N.M. 1981)(Holding, in a real estate transaction, "[a]ctionable fraud consists of misrepresentation of a fact, known to be untrue by the maker, and made with an intent to deceive and to induce the other party to act in reliance thereon to his detriment.").

59.      New Mexico courts impose a duty to disclose superior information in real estate transactions.  *Wirth v. Commercial Resources, Inc.*, 96 N.M. at 345 (Holding fraud was found when the seller of real property held "superior knowledge of the possibility" that "the underground water supply would run out".); *Wilcox v. Homestake Mining Co.*, 401 F.Supp.2d at 1204 (Holding a duty to disclose existed where the defendant solicited Plaintiffs to move to the subdivisions, and created the mistaken belief that defendant would supply plaintiffs with drinking water, when defendant had superior knowledge that the drinking water had been contaminated.); *Mountain Highlands, LLC v. Hendricks*, 2009 WL

1300750, at *5 (D. N.M., Feb. 13, 2009)(Finding, in a real estate transaction, "[t]he

Defendants, however, would be under a duty to disclose the basic underlying facts

to put them on equal footing.").

60.    This duty to disclose material facts, in a real estate transaction, is held

to exist even if the material facts could be discovered through a review of public

property records.  *Daly v. Bernstein*, 28 P. at 766 ("As a matter of fact, the record

title kept by the government has but one purpose,—to protect innocent purchasers

who may buy with simply the knowledge of the record, either actual or

constructive.  **Such a record does not have for its purpose the protection of a**

**vendor who may fraudulently sell the property to a party, even though that**

**party might have found by the record that the title was imperfect.**")(emphasis

added); *Wirth v. Commercial Resources, Inc.*, 96 N.M. at 345 ("Finally, McGregor

argues that since the Spiegel report [on the underground water supply] was a

matter of public record, Wirth had a duty to investigate and find it.  In New

Mexico, the vendee has no duty to investigate the statements of the vendor.  Wirth

had no duty to discover the report.")(citing *Steadman v. Turner*, 84 N.M. 738

(Ct.App.1973), internal citations omitted).

61.    Here, on December 18, 2005, JAYME fraudulently signed a Purchase

Agreement purportedly selling the Thoroughbred Property to the MONGES, even

though he knew he no longer had title to the Thoroughbred Property, because the

Thoroughbred Property had already been purchased by Citibank at a foreclosure sale on November 1, 2005.  (P-01, DAT Parsley 000358-DAT Parsley 000366; ROA.1794:5-21; ROA.1093:18-22).

62.     Therefore, JAYME was under the duty to disclose his lack of title, but remained silent and failed to disclose the material fact that he no longer had title to the Thoroughbred Property.  JAYME thus fraudulently sold the Thoroughbred Property to the MONGES, by signing the Purchase Agreement, knowing he did not hold title, and by remaining silent, thereby misrepresented to the MONGES that he did hold title, which the MONGES relied on to their detriment, by buying the Thoroughbred Property.

63.     Then, on February 3, 2006, JAYME fraudulently signed a Warranty Deed purportedly conveying the Thoroughbred Property to the MONGES (P-02, DAT-Blount-000005), despite the fact that JAYME actually knew a New Mexico court had already approved Citibank's title to the Thoroughbred Property, because a Special Master's Report of Sale had been filed in JAYME's litigation, on January 9, 2006, along with a Special Master's Deed, and an Order Approving Sale and Special Master's Report.  (P-05, RLBA Rivers 000112-RLBA Rivers 000121). JAYME was thus under the duty to disclose his lack of title, but again remained silent and failed to disclose the material fact that he no longer had conveyable title to the Thoroughbred Property.

64.     Therefore, considering JAYME already knew a New Mexico court had approved Citibank's title, yet failed to disclose to the MONGES that Citibank's title had been approved by a court, JAYME thus fraudulently conveyed the Thoroughbred Property to the MONGES, by signing the Warranty Deed, knowing he did not hold conveyable title, and by remaining silent, thereby misrepresented to the MONGES that he did hold title, which the MONGES justifiably relied on to their detriment, given that the MONGES were not under a duty to search the record.

65.     Thus, because the sale and the conveyance of the Thoroughbred Property, by ROJAS/JAYME, to the MONGES, were fraudulent, the District Court's Order was clearly erroneous, legal error, and/or an abuse of discretion.

### 2.     A Right To Redeem Foreclosed Real Property Is Not A Property Right Or A "Claim To Ownership".

66.     It is well settled in New Mexico law, that after a foreclosure sale, the mortgagor loses all rights and interest in the foreclosed property, except the right to redeem the property.  *Gunby v. Doughton*, 228 P. 603, 603 (N.M. 1924)("In this connection it is to be remembered that by a decree of foreclosure, and a decree of confirmation of sale thereunder, all of the rights of the parties are merged and passed to the purchaser. The mortgagee no longer has any mortgage lien, and the mortgagor no longer has any title to the property."); *Ulivarri et al. v. Lovelace*, 38 P.2d 1114, 1115 (N.M. 1934)("Since the decision in the Gunby Case, it has not

been questioned that our statute gives the purchaser the legal title upon the confirmation of the sale….”); *Plaza National Bank v. Valdez*, 106 N.M. 464, 466 (N.M. 1987) (“When the bank became the purchaser at the judicial sale on December 10, 1985, all of the rights of the parties merged and passed to the bank as purchaser, excepting only the sole right of the mortgagor to redeem—a right which did not arise out of the mortgage or the decree, but a right extended by statute.”)(citing *Ulivarri v. Lovelace,* 38 P.2d at 1115).

67.     The right to redeem property, after a foreclosure sale, does not exist under the common law, but is a right which must be created by a statute. *Parker v. Dacres*, 130 U.S. 43, 47 (1889)(“Counsel for the plaintiff speaks of a common-law right of redemption after sale that attaches in the absence of any statutory provision on the subject.  We are not aware of any such right existing at common law, or in the system of equity as administered in the courts of England previous to the organization of our government.”).  A statutory right of redemption does not create an interest in the foreclosed property, but is merely a personal privilege to redeem. *Layton v. Thayne*, 133 F.2d 287, 289 (10th Cir. 1943)(the right of redemption “is a mere personal privilege rather than an interest or estate in the land. . . . It does not constitute any interest or estate in the real estate itself.”).  Accordingly, when Citibank foreclosed on the Thoroughbred Property on November 1, 2005, JAYME lost all of his “rights” to the Thoroughbred Property, except his right to redeem,

which did "not constitute any interest or estate in the" Thoroughbred Property.

68.     Although case law is quite clear that JAYME lost all of his "rights" and "interests" to the Thoroughbred Property, the Final Order nonetheless found JAYME did not "necessarily misrepresent a fact" to the MONGES when JAYME agreed to "sell" the Thoroughbred Property, supposedly because JAYME had a "claim to ownership", presumably due to "a statutory right of redemption". (ROA.2964).

69.     However, the Final Order improperly attempts to re-write the agreement of the parties, and the benefit of their bargain, as the Purchase Agreement of the parties nowhere contemplates (a) the sale and conveyance of a "claim to ownership" to the Thoroughbred Property, or (b) the sale and conveyance of JAYME's statutory right to redeem.  Contrary to the implications of the Final Order, the Purchase Agreement explicitly provided for JAYME to "sell and convey" the Thoroughbred Property (and necessarily, all of his "rights" and "interests" therein), not some "claim to ownership" (whatever that is), or even the right to redeem the right to sell and convey.  (See P-01, DAT Parsley 000358).

70.     Under New Mexico law, when Citibank foreclosed on the Thoroughbred Property on November 1, 2005, JAYME lost all of his "rights" and "interests" to the Thoroughbred Property (including the right to sell), except his right to redeem.  Thus, on December 18, 2005, JAYME fraudulently signed a

Purchase Agreement agreeing to "sell and convey" the Thoroughbred Property, which he had no "rights" or "interests" in, until after he redeemed the Thoroughbred Property, which did not occur until six (6) months later, on June 27, 2006, when Citibank granted the Thoroughbred Property back to JAYME in a Quit Claim Deed. (P-01, DAT Parsley 000322-DAT Parsley 000323).

71.    Similarly, on January 9, 2006, when the New Mexico court approved Citibank's title to the Thoroughbred Property, JAYME lost all of his "rights" and "interests" to the Thoroughbred Property (including the right to sell), except his right to redeem. (P-05, RLBA Rivers 000112-RLBA Rivers 000121). Thus, on February 3, 2006, JAYME fraudulently signed a Warranty Deed purportedly conveying the Thoroughbred Property, which he had no "rights" or "interests" in, until after he redeemed the Thoroughbred Property, four (4) months later, on June 27, 2006, when Citibank granted the Thoroughbred Property back to JAYME in a Quit Claim Deed. (P-02, DAT-Blount-000005).

72.    In short, while New Mexico has created a statutory right of redemption for a mortgagor after a foreclosure sale, the foregoing case law makes clear JAYME had no property "rights" or "interests" in the Thoroughbred Property, after the Citibank foreclosure. Therefore, JAYME lost all "rights" and "interests" to the Thoroughbred Property, and could not have lawfully sold or conveyed title to the Thoroughbred Property, after the Citibank foreclosure.

73.    Contrary to the Final Order, after the Citibank foreclosure, JAYME thus had no "claim to ownership" to the Thoroughbred Property, but merely retained a one (1) month statutory right to redeem the Thoroughbred Property, which was not consummated until June 27, 2006, when Citibank granted the Thoroughbred Property back to JAYME in a Quit Claim Deed.  (P-02, DAT-Blount-000005).  And contrary to the District Court's Order, a right of redemption is not a property "right" or "interest" to the Thoroughbred Property.  To paraphrase *Plaza National Bank*, at 466, "When the (Citibank) bank became the purchaser at the judicial sale . . . all of the rights of JAYME merged and passed to the bank as purchaser."  Therefore, on February 6, 2006, JAYME fraudulently conveyed the Thoroughbred Property, without actually owning a legal property "right" or "interest" to title to the Thoroughbred Property.

74.    Furthermore, even if JAYME's statutory right to redeem could somehow be considered a "claim to ownership" of the Thoroughbred Property, JAYME's statutory right to redeem the Thoroughbred Property was lost when he conveyed ALL of his legal rights to the Thoroughbred Property to the MONGES, on February 6, 2006.  Thus, on February 6, 2006, when JAYME executed a Warranty Deed conveying, to the MONGES, his legal "rights" and "interests" to the Thoroughbred Property, JAYME lost his right to redeem the Thoroughbred Property, thereby nullifying his statutory right to redeem.

75.     Accordingly, the District Court's finding that JAYME did not commit fraud was clearly erroneous, legal error, and/or an abuse of discretion.

**B.     ROJAS/JAYME Fraudulently Misrepresented To The Monges That They Would Timely Make Their Lease Payments On The Thoroughbred Property.**

76.     The Final Order stated ROJAS/JAYME did not "necessarily misrepresent a fact" to the MONGES, as concerns the rental payments for the Thoroughbred Property.  For support, the Final Order, the District Court cites an email, sent by ROJAS, allegedly showing that ROJAS/JAYME "intended to use the money they received from their other investments with Plaintiffs (i.e., the sale of lots in the Country Cove Subdivision) to pay the rent on the" Thoroughbred Property.  (ROA.2964).

77.     However, the email cited in the Final Order makes no such claim or implication.  (Compare ROA.2964, with P-46, Monge Mortgage Payments2 000024-Monge Mortgage Payments2 000026).  Instead, ROJAS merely claimed that, because she was behind on the rental payments, she hoped to soon make a sale on the Country Cove Subdivision, which should enable her to pay the MONGES.  Therefore, contrary to the Final Order, said email does not state that using the proceeds from the sale of lots had been the agreement of the parties.

78.     Instead, contrary to the findings of the District Court, neither the Lease, nor any other evidence in the record, even suggests that the agreement of the parties was that ROJAS/JAYME would pay the rent on the Thoroughbred

41

Property, from the money from the joint venture development of Country Cove by the parties herein. In fact, Rent under the Residential Lease was "due and payable on or before the first day of each and every calendar month during the Term", commencing February 1, 2006. (P-31, LR-000057–LR-000065).

79.     As such, the Final Order again improperly attempts to re-write the agreement of the parties, and the benefit of their bargain, as the Lease Agreement of the parties nowhere provides that ROJAS/JAYME would pay the rent on the Thoroughbred Property, from the money from the joint venture development of Country Cove by the parties herein.

80.     In fact, the MONGES testified they would have never entered into the sale and leaseback of the Thoroughbred Property, if they had known ROJAS/JAYME were not going to timely pay rent on the Thoroughbred Property. (ROA.1707:10-24).

81.     Moreover, if ROJAS/JAYME "intended to use the money they received from their other investments with Plaintiffs to pay the rent on the" Thoroughbred Property, that intention was never disclosed to the MONGES, and the record herein nowhere suggests that was in fact disclosed to the MONGES. And if that was the intentions of ROJAS/JAYME, then ROJAS/JAYME were under a duty to disclose, to the MONGES, the material fact that ROJAS/JAYME would not be timely paying their rent on the Thoroughbred Property until

ROJAS/JAYME derived money from the joint venture development of Country Cove by the parties herein.

82.    Similarly, JAYME did not disclose to the MONGES the material fact that JAYME had been in bankruptcy proceedings four (4) times, the previous three (3) years, because he could not timely pay his mortgage payment to Citibank.  (P-25, P-26, P-27, P-28, and P-05, RLBA-Rivers-000093).  Hence, possessing Superior Knowledge of their financial inabilities, ROJAS/JAYME were under a duty to disclose, to the MONGES, the material fact that ROJAS/JAYME probably would not be able to timely pay their $5,595 monthly rent on the Thoroughbred Property (P-31, Monge-Mortgage-Pmts Page 1), since ROJAS/JAYME could not even timely pay their $3,593 monthly mortgage payments to Citibank. (ROA.848:2-ROA.849:20).

83.    In sum, ROJAS/JAYME failed to disclose to the MONGES the material fact that they probably would not be able to timely pay their $5,595 monthly rent on the Thoroughbred Property, until ROJAS/JAYME derived money from development of Country Cove.  As a result of ROJAS/JAYME's fraudulent misrepresentations through non-disclosure, the MONGES were induced to purchase the Thoroughbred Property from JAYME, and to lease the Thoroughbred Property to ROJAS.  As ROJAS/JAYME knew they would not be able to make the rental payments on the Thoroughbred Property, the MONGES suffered severe

financial and economic harm.  Accordingly, the District Court's finding that

ROJAS/JAYME did not commit fraud on the lease was clearly erroneous, legal

error, and an abuse of discretion.

**V.    The Order Finding That Jayme Did Not Commit Fraud By Non-Disclosure, In The Sale And Conveyance Of The Thoroughbred Property To The Monges, Was Clearly Erroneous, Constitutes Legal Error, And/Or An Abuse Of Discretion.**

84.    Under New Mexico law, a claim for Fraud by Non-Disclosure

requires showing a party to a transaction knew material facts, had a duty to

disclose those material facts, and remained silent.  Such a duty to disclose may

arise if the party to the transaction knows the other party is acting under a mistaken

belief.  *Krupiak v. Payton*, 90 N.M. 252, 253 (N.M. 1977)("Actionable fraud is

found if a party to a transaction knows of material facts, has a duty to disclose, and

remains silent.  A duty to disclose may arise if there is knowledge that the other

party to a contemplated transaction is acting under a mistaken belief.").

85.    Yet, in the Final Order, the District Court concluded ROJAS/JAYME

had no duty to disclose that the Thoroughbred Property was in foreclosure, or that

JAYME had filed for bankruptcy, purportedly because the foreclosure could be

revealed by a title search, and because bankruptcy filings are public records, which

the MONGES could have discovered through "the exercise of reasonable

diligence".  (ROA.2966).

86.    However, as discussed above, New Mexico has held that even if a title

search, performed by a purchaser of real property, would have revealed the seller lacked valid title to the real property, the purchaser is not prevented from bringing a claim for fraud against the seller if the purchaser relied on the seller's misrepresentation that he held valid title to the real property. *Daly*, 28 P. at 766 ("As a matter of fact, the record title kept by the government has but one purpose,—to protect innocent purchasers who may buy with simply the knowledge of the record, either actual or constructive. Such a record does not have for its purpose the protection of a vendor who may fraudulently sell the property to a party, even though that party might have found by the record that the title was imperfect."). See also *Wirth, supra*, 96 N.M. at 345, and *Steadman, supra*, 84 N.M. at 507. Accordingly, the fact that a title search would reveal a defect of title does not shield a fraudulent party from a claim for fraud.

87.    Additionally, the MONGES did exercise their "reasonable diligence", by relying on the title search performed by Dona Ana Title Company. However, although the title search revealed (a) the filing of a Lis Pendens by Citibank (P-01, DAT Parsley 000012), (b) JAYME's bankruptcy proceedings, and (c) the foreclosure of the Thoroughbred Property (P-01, DAT Parsley 000015), the results of the title search were never disclosed to the MONGES by Dona Ana Title, prior to closing, even though Blount was present at the closing. (ROA.1175:9-ROA.1176:5). Instead, Dona Ana Title warranted the sale, by creating and

45

notarizing the Warranty Deed (P-02, DAT Blount 000005), and closing the sale,

thereby implying to the MONGES that there was no issue with JAYME's title.

88.    The MONGES thus exercised "reasonable diligence" when they relied

on Dona Ana Title to perform the title search regarding the Thoroughbred

Property, and disclose any exceptions to title.  Accordingly, the District Court's

finding that JAYME did not commit Fraud by Non-Disclosure was clearly

erroneous, legal error, and an abuse of discretion.

## VI.    The Order Finding That ROJAS/JAYME Did Not Breach A Duty Of Good Faith And Fair Dealings To The Monges Was Clearly Erroneous, Constitutes Legal Error, And/Or An Abuse Of Discretion.

89.    Every party to a contract owes a duty of good faith and fair dealings

upon the parties.  *Watson Truck & Supply Co., Inc. v. Males*, 111 N.M. 57, 60

(N.M. 1990)("Whether express or not, every contract imposes upon the parties a

duty of good faith and fair dealing in its performance and enforcement.").  To

show a breach of this duty, evidence of "bad faith or that one party wrongfully and

intentionally used the contract to the detriment of the other party" must be shown.

*Continental Potash, Inc. v. Freeport-McMoran, Inc.*, 115 N.M. 690, 706 (N.M.

1993).  Such a requirement is met if it is shown that a party entered into a contract

knowing he or she would not honor the contract.  *Romero v. Mervyn's*, 109 N.M.

249, 258 (N.M. 1989)(Holding a party acted with malice when he entered into a

contract knowing it would not be honored.).

90.     The duty of good faith and fair dealings upon the parties is a fiduciary duty in joint venture business relations. *Quirico v. Lopez*, 106 N.M. 169, 170 (N.M. 1987)("A joint venture is formed when the parties agree to combine their money, property or time for conducting a particular business venture and agree to share jointly in profits and losses, with the right of mutual control over the business enterprise or over the property."); *Lightsey v. Marshall*, 128 N.M. 353, 357 (N.M. 1999)(Holding that, like in a partnership, there exists a fiduciary duty between members of a joint venture.); *Chavez Properties-Airport Parking Albuquerque, LP v. Lorentzen*, 204 Fed.Appx. 745, 750 (10th Cir. 2006)("Like partners in a partnership, a fiduciary relationship exists between parties to a joint venture."); *Harrington v. Sorelle*, 313 F.2d 10, 13 (10th Cir. 1963)(Holding "there must be good faith between joint adventurers."); *Homestake Mining Co. v. Mid-Continental Exploration Co.*, 282 F.2d 787, 799 (10th Cir. 1960)(Holding that, when applying New Mexico law, "the relationship created by a joint adventure is fiduciary in character and requires the utmost good faith on the part of all parties thereto.").

91.     In the Final Order, the District Court concluded ROJAS/JAYME did not breach a duty of good faith and fair dealings to the MONGES as "there is no evidence that their intent from the outset was to breach", and because supposedly ROJAS/JAYME "paid $12,568.00 in rental payments during the term of the lease." (ROA.2968). The Final Order is in error, as ALL of the checks for those

"$12,568.00 in rental payments during the term of the lease" bounced, due to insufficient funds, so ROJAS/JAYME never actually paid anything during the term of the lease. (P-31, Monge-Mortgage-Pmts, Page 1). In fact, in the months immediately prior to, and after, the signing of the Lease, ROJAS did not have enough funds in her accounts to make the required payments. (P-18, CBT Rojas-000087-CBT Rojas-000101; CBT Rojas-000255-CBT Rojas-000276; P-16, Compass-FirstMTG-000002-Compass-FirstMTG-000017). Similarly, throughout the Term of the Lease, ROJAS/JAYME consistently did not have enough money in their bank accounts to make the required payments. (See P-13, P-14, P-15, P-16, and P-18).

92.    Because ROJAS/JAYME were parties to a joint venture agreement with the MONGES, ROJAS/JAYME owed a fiduciary duty of good faith and fair dealings to the MONGES. But ROJAS/JAYME did not comply with their fiduciary duty of good faith and fair dealings, by failing to disclose to the MONGES, prior to the joint venture agreement, that ROJAS/JAYME knew, or should have known, (a) they did not have any equity in the Thoroughbred Property, (b) they would not have enough funds in their accounts to make the required monthly payments, (c) they probably would not be able to timely pay their $5,595 monthly rent on the Thoroughbred Property, considering they could not even timely pay their $3,593 monthly mortgage payments to Citibank, and, of course,

48

(d) JAYME was repeatedly in bankruptcy proceedings because he could not pay

his $3,593 monthly mortgage payment to Citibank.  (ROA.848:2-ROA.849:20).

93.    Thus, ROJAS/JAYME maliciously entered into the lease knowing

they would be unable to comply with their agreement with the MONGES.  *Romero*

*v. Mervyn's*, 109 N.M. 249, 258 (N.M. 1989)(Holding a party acted with malice

when he entered into a contract knowing it would not be honored.).  Accordingly,

the District Court's finding that ROJAS/JAYME did not breach a fiduciary duty of

good faith and fair dealings to the MONGES was clearly erroneous, legal error,

and an abuse of discretion.

**VII.   The Order Finding That The Monges Should Have Been Aware There Was No Equity In The Thoroughbred Property Was Clearly Erroneous, Constitutes Legal Error, And/Or An Abuse Of Discretion.**

94.    The Final Order found the MONGES did sign a HUD-1 "and should

have been aware that Defendants received no cash from the sale of the

Thoroughbred Property".  (ROA.2949-ROA.2950).  As support for its finding that

the MONGES signed a HUD-1 and therefore "should have been aware that

Defendants received no cash", the Final Order claims that "the only evidence that

their signatures were forged is Plaintiff Rosana Monge's self-serving statement

that she did not sign the HUD document", while acknowledging the MONGES

maintained their signatures on the HUD-1 were forged.

95.    Significantly, no expert (or factual) testimony was adduced by ROJAS

or JAYME, or the Bankruptcy Court, to either (a) rebut the testimony of the

MONGES that their signatures had been forged, or (b) support the findings in the Final Order concerning whether the signatures of the MONGES had been forged. In fact, contrary to the findings in the Final Order, the alleged signatures of the MONGES don't actually appear on any of the HUD-1s ("OMB Form No. 2502-0265"), but appear only on the separate (and interchangeable) "SELLER'S AND/OR PURCHASER'S/BORROWER'S STATEMENT" accompanying some of the HUD-1s ("Vision Form SAO01NM"). Lacking expert testimony from a handwriting expert, it was improper for the District Court to render the expert opinion rejecting "Rosana Monge's self-serving statement that she did not sign the HUD document".

96.    Similarly, absolutely no evidence in the record exists to support the finding in the Final Order that the MONGES "should have been aware that Defendants received no cash from the sale of the Thoroughbred Property". To the contrary, the estimated HUD-1 prepared by Dona Ana Title, and provided to Countrywide, dated January 31, 2005, just three (3) days before closing, estimated there would be Seven Hundred Six-Five Thousand Nine Hundred and Three Dollars and Seven-Nine Cents ($765,903.79) in equity available to JAYME. (P-04, FATI-Peterman-000128-FATI-Peterman-000130).

97.    Perhaps more significantly, Dona Ana Title's "revised" FINAL HUD-1 of February 3, 2006, that was actually approved and signed by the lender,

50

Countrywide, estimated Two Hundred Six Thousand Three Hundred Forty-One Dollars and Thirty-Eight Cents ($206,341.38) in cash disbursement to JAYME of equity available. (P-04, FATI-Peterman-000120-FATI-Peterman-000121). Importantly, Dona Ana Title's "revised" FINAL HUD-1 was faxed to Countrywide on February 3, 2006, the day of the closing, at 12:03, presumably PM.

98.     Therefore, it seems quite clear that, on the very day of the closing, Countrywide and Dona Ana Title were themselves not yet "aware" that JAYME would be receiving "no cash from the sale of the Thoroughbred Property", so it seems incomprehensible how or why the District Court could conclude that the MONGES could somehow divine otherwise. In other words, if both the Lender and the disbursing Escrow Agent didn't know, as of lunchtime on the day of closing, that JAYME would be receiving "no cash from the sale of the Thoroughbred Property", how could the MONGES possibly know otherwise? The findings in the Final Order have no basis in fact, and are simply counterintuitive.

99.     For example, the District Court retroactively relied on the HUD-1 that the Bankruptcy Court determined (per stipulation of the parties), reflected the disbursements actually made at closing, showing zero amount of equity to JAYME, as the *ex post facto* basis for its finding that the MONGES "should have been aware that Defendants received no cash from the sale of the Thoroughbred Property". (ROA.1655:01-ROA.1655:12; P-04, FATI-Peterman-000045-FATI-

Peterman-000047).  As such, the findings of the District Court, that the MONGES

"should have been aware that Defendants received no cash", erroneously hinges on

the "actual" disbursements, made after the fact, rather than on what even the

Lender and the Escrow Agent, estimated during lunchtime on the day of the

closing, would be available.  (P-04, FATI-Peterman-000120-FATI-Peterman-

000121).  The District Court's *post factum* logic thus erroneously and improperly

rejects the uncontroverted testimony of ROSANA MONGE that "she did not

receive the HUD-1 prior to closing."  (ROA.1232:02-ROA.12332:18).

100.    Critically, when the MONGES asked for a copy of the HUD-1 after

closing, they were not provided one.  (ROA.1233:01-ROA.12333:15).  After

waiting about six (6) weeks, the MONGES then asked ROJAS for a breakdown of

the disbursements from the sale, but instead of providing a copy of the HUD-1 or

the Disbursement Report, ROJAS wrote on a sticky that there had been Three

Hundred One Thousand Dollars ($301,000.00) in equity.  (ROA.1233:01-

ROA.123:21; ROA.1248:11-ROA.1249:10; P-32, LR-000212).

101.    In contradistinction to the District Court's retrospective analysis, if the

MONGES had actually been aware of the HUD-1 showing no equity in the

Thoroughbred Property, there would have been no need for the MONGES to

request an accounting of the disbursements from ROJAS, or for ROJAS to write

the sticky for the MONGES.  By extension, if the MONGES had actually signed

the HUD-1 showing no equity in the Thoroughbred Property, there would have been no need for the MONGES to request an accounting of the disbursements from ROJAS.

102.   In this regard, it is important to note that neither ROJAS nor JAYME, or even Ms. Blount, ever testified that the MONGES (a) did in fact sign the HUD-1 showing no equity, or (b) were in fact aware that JAYME would receive no cash from the sale.  And as discussed above, Dona Ana Title did not actually mail the "conveyance documents" and the "title policy" to the MONGES (albeit to the wrong address), until December 8, 2006, more than ten (10) months after the closing, and yet somehow failed to include the correction deeds.  (P-01, DAT-Parsley 000342 and DAT-Parsley 000348).  The only reasonable conclusion is that the MONGES were kept in the dark by ROJAS/JAYME, and Ms. Blount.  Hence, the finding of the District Court, that the MONGES "should have been aware that Defendants received no cash from the sale of the Thoroughbred Property", is totally at odds with the uncontroverted facts.

103.   It is understandable why the District Court would be so confused, as even the Bankruptcy Court and counsel for the parties were confused by so many HUD-1s in the record.  (ROA.1652:14-ROA.1656:11).  For example, despite the District Court's repeated reference to "the HUD document", the record shows at least six (6) different HUD-1 Settlement Statements were created, five (5) of which

state they are "FINAL". (P-04, FATI-Peterman-000045-FATI-Peterman-000047;

FATI-Peterman-000120-FATI-Peterman-000121; FATI-Peterman-000129-FATI-

Peterman-000130; FATI-Peterman-000133-FATI-Peterman-000134; P-11, BofA-

Sierra-Crest1-000839-BofA-Sierra-Crest1-000841; P-10, BofA-Thoroughbred-

000364-BofA-Thoroughbred-000366).[3]

104.    The MONGES' purported signatures appear on three (3) of the six (6)

"SELLER'S AND/OR PURCHASER'S/BORROWER'S STATEMENT"

accompanying the HUD-1s, all with the same date, and all of which are stamped

"FINAL". While two (2) of these three (3) HUD-1s purportedly signed by the

MONGES state there was no equity (P-04, FATI-Peterman-000045-FATI-

Peterman-000047; P-10, BofA-Thoroughbred-000364-BofA-Thoroughbred-

000366), the other states there was Two Hundred Six Thousand Three Hundred

Forty-One Dollars and Thirty-Eight Cents ($206,341.38) in equity. (P-11, BofA-

Sierra-Crest1-000839-BofA-Sierra-Crest1-000841).[4] Therefore, the

uncontroverted facts are that the true amount of equity to be disbursed to JAYME

was unknown to the MONGES (and to Countrywide, and even Dona Ana Title),

---

[3] There are numerous other HUD-1s in the record, but reviewing them all would exhaust the word count allowed by this Court.

[4] Interestingly, this latter HUD-1was faxed by ROJAS or JAYME, from their business, First Mortgage of El Paso, on July 26, 2006, six (6) months after the closing, so as to show the disbursement of $206,341.38 in equity. (P-11, BofA-Sierra-Crest1-000839-BofA-Sierra-Crest1-000841).

even on the very day of the closing, during lunchtime, at the Red Lobster.

105.    Accordingly, the District Court's finding that the MONGES should have been aware, prior to closing, there was no equity in the Thoroughbred Property was clearly erroneous, legal error, and/or abuse of discretion.

## VIII. The Order Finding That The District Court Could Not Determine Who Signed The Four Fraudulent Leases Was Clearly Erroneous, Constitutes Legal Error, And/Or An Abuse Of Discretion.

106.    In the Final Order, the District Court declared it could not determine whether the MONGES signed the four (4) fraudulent leases, as the District Court was not persuaded by the MONGES' "self-serving statements regarding their signatures." (ROA.2952).  The District Court did not need to rely solely on these denials to conclude the MONGES never signed the fraudulent leases.

107.    The signature on the first lease clearly reads "Joe R. Monge" (P-10, BofA-Thoroughbred-000277) and not "Joe J. Monge".  The first two fraudulent leases were included in the Assets and Liabilities section (P-10, BofA-Thoroughbred-000363) of a Uniform Residential Loan Application for the Thoroughbred Property, which does not contain the signatures of the MONGES anywhere.  The third and fourth fraudulent leases were included in the Assets and Liabilities section (P-11, BofA-Sierra-Crest1-000768), on another loan application for the Sierra Crest Property, which also does not contain the signatures of the MONGES.  However, there was a second copy of the Assets and Liabilities section, signed by the MONGES (P-11, BofA-Sierra-Crest1-000769), which does

not include any of the fraudulent leases.  Importantly, ROJAS' employee, Herrera, admitted to preparing the leases (ROA.1583:10-11; ROA.1584:15-19; ROA.1571:16-18; ROA.1575:22-ROA.1576:4) with information provided to her by ROJAS (ROA.1584:4-7; ROA.1573:5-10), and also admitted ROJAS occasionally provided her with blank copies of documents which bore the MONGES' signatures.  (ROA.1588:13-16).  Furthermore, ROJAS/JAYME never denied preparing the fraudulent leases, while the MONGES expressly denied having ever signed them.  (ROA.1262:23-ROA.1263:7; ROA.1260:21-24; ROA.1264:14-ROA.1265:13; ROA.1265:19-21).

108.   The uncontroverted record thus shows (a) the name placed on the first fraudulent lease does not belong to JOE MONGE, (b) the MONGES never signed a document showing the first two leases were included in the Thoroughbred Property loan application, (c) the MONGES signed a copy of the Assets and Liabilities section for the Sierra Crest Property loan application which did not list any of the fraudulent loans, (d) ROJAS was the mortgage broker processing the loan applications, and (e) ROJAS' employee, Herrera, admitted she prepared the leases.  The Final Order becomes even more inexplicable, considering the MONGES called all of the witnesses, on direct examination at the trial, to testify as to the forgery of the leases.  Thus, the uncontroverted record is clear that the MONGES did not sign the leases, the leases were created by ROJAS, through her

56

assistant Herrera, as part of ROJAS' fraudulent loan applications, and the

MONGES did not include the fraudulent leases on their loan applications.

109.   Accordingly, the District Court's finding that it could not determine

whether the MONGES signed the fraudulent leases was clearly erroneous, legal

error, and/or abuse of discretion.

**IX.   The Order Finding That The Monges Were Not Entitled to Punitive Damages Was Clearly Erroneous, Constitutes Legal Error, And/Or An Abuse Of Discretion.**

**A.     The Monges Are Entitled To Punitive Damages As ROJAS/JAYME Knowingly Committed An Egregious Violation Of The Automatic Stay.**

110.   Under 11 U.S.C. §362(k)(1), punitive damages may be awarded for a

willful violation of the automatic stay "in appropriate circumstances".  The Fifth

Circuit applies an "egregious conduct standard" to determine what conduct

constitutes "appropriate circumstances".  *In re Repine*, 536 F.3d 512, 521 (5th Cir.

2008)("We agree that an egregious conduct standard is appropriate.").

111.   In the Final Order, the District Court stated the MONGES were not

entitled to punitive damages for an egregious violation of the automatic stay as the

MONGES "failed to meet their burden to establish egregious conduct".

(ROA.2960-ROA.2961).  The District Court relied on *In re Bloom*, 875 F.2d 224

(9th Cir. 1989), to argue the Fifth Circuit "has determined that continuing to violate

the automatic stay **after being repeatedly warned about the violation of the stay**

is an example of egregious conduct."  (ROA.2960)(emphasis added).  Despite the

fact that, on numerous occasions, the MONGES warned ROJAS/JAYME about the lease violations, the District Court found none of these warnings included references to violations of the automatic stay. Therefore, the District Court found the MONGES were not entitled to punitive damages. (ROA.2960-ROA.2961).

112.   The District Court's reliance on *In re Bloom* is misplaced. *In re Bloom*, which is a Ninth Circuit case, and not a Fifth Circuit case, did not limit punitive damages to when the violator was expressly warned his actions violated the automatic stay, as the District Court erroneously claimed.[5] Instead, district courts within the Fifth Circuit have more broadly held *In re Bloom* to hold punitive damages may be awarded when a violation of the automatic stay represents a "reckless or callous disregard for the law or rights of others." *Nissan Motor Acceptance Corp. v. Baker*, 239 B.R. 484, 490 (N.D. Tex. 1999)(quoting *In re Bloom*, 875 F.2d at 228).

113.   Furthermore, bankruptcy courts within the Fifth Circuit have consistently held punitive damages may be awarded when the violator of the automatic stay acted with actual knowledge of the violation. *In re Jones*, 418 B.R. 687, 700 (Bankr. E.D. La. 2009)("Punitive damages may be recovered when the creditor acts with actual knowledge of the violation or with reckless disregard of the protected right.")(quoting *In re Dynamic Tours & Transportation, Inc.*, 359 B.R. 336, 343 (Bankr. M.D. Fla. 2006)); *In re Burns*, 503 B.R. 666, 680 (Bankr.

---

[5] The District Court also erroneously cited *In re Bloom* as available at 875 F.3d 224.

S.D. Miss. 2013)(Holding repeated efforts to collect from a Debtor, despite

knowledge of Debtor's bankruptcy filing, was an egregious violation of the

automatic stay, and allowed recovery of punitive damages.).

114.    ROJAS/JAYME refused to pay any rent after April 2008, while

continuing to retain possession of the Thoroughbred Property, throughout the

MONGES' Chapter 11 proceedings.  (ROA.1744:4-8).  ROJAS/JAYME were

aware the MONGES were in bankruptcy since at least June 2009, when

ROJAS/JAYME were listed on the MONGES' Schedule F as creditors and would

have been sent notice.  (RE-O-000017-RE-O-000018).  ROJAS/JAYME were also

aware of the effect of the automatic stay imposed by bankruptcy proceedings, as

JAYME himself had filed for bankruptcy numerous times, to impose automatic

stays, in efforts to avoid foreclosure.  (ROA.2418, Paragraph 75).  ROJAS/JAYME

cannot now assert they were unaware, or had somehow forgotten, that filing a

petition in bankruptcy imposes an automatic stay.  ROJAS/JAYME knew the

MONGES were in bankruptcy, and yet continued to possess the Thoroughbred

Property, without paying any rent, in willful violation of the automatic stay,

beginning May 2008, and continuing (a) throughout the MONGES' bankruptcy

proceedings, (b) after the District Court ordered the turnover of the Thoroughbred

Property, and (c) even after the filing of the instant appeal.  (P-31, Monge-

Mortgage-Pmts, Page 1-2; ROA.2969; ROA.2974-ROA.2983).  Quite simply,

ROJAS/JAYME epitomize the standard of "reckless or callous disregard for the law or rights of others."

115.   Accordingly, the District Court's finding that the MONGES were not entitled to punitive damages was clearly erroneous, legal error, and an abuse of discretion.

**B.     The Monges Are Entitled To Punitive Damages For An Egregious Violation Of The Automatic Stay As Jayme Attempted To Sell The Thoroughbred Property While It Was Part Of The Monges' Bankruptcy Estate.**

116.   To argue egregious conduct, the MONGES cited to the fact that JAYME, in February 2012, without the permission of the MONGES, created a FAST Order sheet to sell the Thoroughbred Property, despite the fact that the Thoroughbred Property was part of the bankruptcy estate of the MONGES. (ROA.2614, Paragraph 51-ROA.2615, Paragraph 53).   In the Final Order, the District Court declared the FAST Order sheet "does not clearly establish" JAYME was attempting to sell the Thoroughbred Property, and "there is no credible testimony regarding" the attempted sale.   (ROA.2961, Footnote 16).   Both findings by the District Court are clearly erroneous.

117.   The uncontroverted record clearly shows the FAST Order sheet was an attempt to sell the Thoroughbred Property, as it lists "Jayme Francisco J" as the "Seller" of the Thoroughbred Property, and "Jayme Joe J" as the "Buyer".   (P-04, FATI-Peterman-000235).   The FAST Order listing JAYME as the "Seller", and a

fictitious name listed as the "Buyer", is a clear example of JAYME's intention to fraudulently sell the Thoroughbred Property. ROSANA MONGE credibly testified as to this fact in the AP. (ROA.1272:9-ROA.1273:9). The USBC found RONASA MONGE's testimony "was often credible with respect to the Thoroughbred Property transactions". (ROA.2405, Paragraph 33(C)). In the Final Order, the District Court noted that "the Bankruptcy Court Judge was in the best position to make determinations regarding Plaintiffs' credibility". (ROA.2949, Footnote 9). ROJAS/JAYME thus brazenly embody a "reckless or callous disregard for the law or rights of others", and the Bankruptcy Court's jurisdiction.

118.   Accordingly, the District Court's finding that the MONGES were not entitled to punitive damages was clearly erroneous, legal error, and/or an abuse of discretion.

**C.    The Monges Are Entitled To Punitive Damages For Breach Of Contract As ROJAS/JAYME Acted Maliciously When They Breached The Contract.**

119.   Under New Mexico law, punitive damages are available for breach of contract when evidence is presented showing "a culpable mental state or other form of overreaching, malicious, or wanton conduct." *Construction Contracting & Management, Inc. v. McConnell*, 112 N.M. 371, 375 (N.M. 1991).

120.   In the Final Order, the District Court stated the MONGES were not entitled to punitive damages for Breach of Contract as the MONGES failed to "show that Defendants had the culpable mental state when they breached the

contract". (ROA.2961-ROA.2962). Specifically, the District Court found that while the MONGES accused ROJAS/JAYME of intentionally concealing the fact that they would not be able to make the rental payments, there was testimony (ROA.848:6-17) indicating ROJAS/JAYME felt they could sell the lots in the Country Cove Subdivision fast enough to make the payments. (ROA.2961).

121. However, the District Court's reliance on the brief excerpt of testimony was misplaced. Immediately following the testimony cited by the District Court, JAYME stated the equity from the Thoroughbred Property would be used to make the rental payments, as follows:

> Q.  But you hadn't even bought the land. How were you going to make the first payment? How were you going to make the first six payments?
>
> A.  The equity that was in them could be used for payments until the first lot was sold.
>
> Q.  And it turns out that equity was zero.

(ROA.848:18-23).

122. As demonstrated above, ROJAS/JAYME, with the assistance of Ms. Blount, went to great lengths to hide, from the MONGES, the fact that there was no equity in the Thoroughbred Property, including creating multiple HUD-1s, failing to give the MONGES copies of the HUD-1s, and misrepresenting to the MONGES that there was $301,000.00 equity in the Thoroughbred Property. Furthermore, in the months immediately prior to, and after, the signing of the

Lease, ROJAS did not have enough funds in her accounts to make the required payments (P-18, CBT Rojas-000087-CBT Rojas-000101; CBT Rojas-000255-CBT Rojas-000276; P-16, Compass-FirstMTG-000002-Compass-FirstMTG-000017), and, throughout the Term of the Lease, ROJAS/JAYME consistently did not have enough money in their bank accounts to make the required payments. (See P-13, P-14, P-16, and P-18). The uncontroverted record is thus quite clear, ROJAS entered into the lease contract (a) knowing she did not have enough money in her accounts to make the rental payments, (b) concealing from the MONGES the fact that there was no equity in the Thoroughbred Property which could be used to make the rental payments, and (c) knowing that the Defendants would not be able to make any rental payments, until some unforeseeable time in the future when the Country Cove lots were sold, if ever. Thus, ROJAS signed the contract while knowing she would in short order breach the contract, which amounted to malicious conduct giving rise to an award of punitive damages.

123.   Accordingly, the District Court's finding that the MONGES were not entitled to punitive damages was clearly erroneous, legal error, and/or an abuse of discretion.

## CONCLUSION

The uncontroverted record is clear that ROJAS/JAYME sold and conveyed the Thoroughbred Property knowing that JAYME no longer had conveyable title to the Thoroughbred Property. Therefore, under New Mexico law, ROJAS/JAYME committed fraud, because ROJAS/JAYME were under a duty to disclose JAYME's lack of title, but failed to do so.

ROJAS/JAYME then committed additional fraud by entering into a lease (a) knowing they did not have enough money in their accounts to make the rental payments, (b) concealing from the MONGES the fact that there was no equity in the Thoroughbred Property which could be used to make the rental payments, and (c) knowing that the Defendants would not be able to make any rental payments, until some unforeseeable time in the future when the Country Cove lots were sold, if ever. Moreover, under New Mexico law, ROJAS/JAYME were under a duty to disclose JAYME's history of been unable to make his mortgage payments, but failed to do so.

Appellants respectfully request that the Court reverse the Findings of Fact of the Bankruptcy Court, and the Final Order of the District Court, in accordance with the above facts and case precedents.

**WHEREFORE**, by reason of the foregoing, Appellants respectfully request that subject Findings be reversed.

September 24, 2015.          Respectfully submitted,

**THE LAW OFFICES OF MICHAEL R. NEVAREZ**
A Professional Corporation
5915 Silver Springs Drive, Building 6, Suite B
El Paso, Texas 79912
Telephone: (915) 584-8000
Facsimile:  (915) 584-8024
Email: MRN@MRN4Law.com


/s/ Michael R. Nevarez_____
**By: MICHAEL R. NEVAREZ**
State of Texas Bar No. 14933400

Attorney for Appellants

## CERTIFICATE OF SERVICE

I hereby certify that two (2) true and correct copies of this brief was served on the persons listed below, in paper form via USPS Overnight Delivery, and in electronic form, on September 24, 2015, as follows:

<u>**ATTORNEY FOR RESPONDENTS:**</u>
Michael J. Zimprich
7001 Westwind Drive, Suite 205
El Paso, TX 79912

<u>**RESPONDENTS:**</u>
Alicia Rojas
103 Horseshoe Court
Santa Teresa, NM 88008

Francisco Jayme
103 Horseshoe Court
Santa Teresa, NM 88008

/s/ Michael R. Nevarez
**MICHAEL R. NEVAREZ**

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because:

THE BRIEF CONTAINS (select one):

A.     13,973   words (excluding the Certificate of Interested

Persons, Table of Contents, Table of Citations, Statement Regarding Oral

Argument, signature page, Certificate of Service, Certificate of Compliance,

and the Addendum, in accordance with Fed. R. App. P. 32(a)(7)(iii), and 5th

Cir. R. 32.2), OR

B.     _____ lines of text in monospaced typeface.

2.     This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because:

THE BRIEF HAS BEEN PREPARED (select one):

A.     in proportionally spaced typeface using:

Software Name and Version:   Microsoft Word 2007

in (Typeface Name and Font Size):   Times New Roman (14)   OR

B.     in monospaced (nonproportionally spaced) typeface using:

Typeface name and number of characters per inch:

_____

**/s/ Michael R. Nevarez**
**MICHAEL R. NEVAREZ**

67

(back cover)